Dear Honorable Cleveland,
The Attorney General is in receipt of your request for an opinion relative to Senate Bill 49, Thirty-Seventh Legislature, First Regular Session, 1979, March 19, 1979, consisting of Sections 1 through 13, codified as 52 O.S. 260-272 (1979). Your request is directed to the constitutionality of Section 12, and states:
"An official opinion is requested of your office as to whether ornot Section 12 of Senate Bill No. 49 is legal and constitutional."
Section 12 of Senate Bill No. 49 provides as follows:
 "SECTION 12. The Corporation Commission by appropriate action shall prescribe a method by which ninety percent (90%) of the gross profits, including transportation charges, derived from sales of natural gas produced in this State and sold in interstate commerce pursuant to Section 2.68 of the General Policy and Interpretations of the Federal Energy Regulatory Commission or Section 311 of the Natural Gas Policy Act of 1978, or under any similar statutory or regulatory provisions subsequently adopted, by public utilities including pipelines subject to the jurisdiction of the Commission, or subsidiaries or affiliates of such utilities are credited against the bills of such utilities' customers located within this State. If such credit is not already being applied by any such utility, the Commission shall require that this be commenced within one hundred twenty (120) days from the effective date of this act."
The Oklahoma Constitution, Article V, Section 57, provides in pertinent part:
 "Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, . . ."
State ex rel Short v. Johnson, 215 P. 945 (Okla. 1923), relates the intent underlying this constitutional provision in the following language:
 "That the foregoing provision has a definite purpose in our organic law is clearly apparent, and the purpose of such provision is by no means new to our jurisdiction. Most every state has a similar provision in its constitution; many have the identical provision; and none but what have some provision looking toward the same purpose. Hence, as its necessity is so generally recognized, its purpose should not be lightly treated. The primary purpose of such provisions has long been recognized, defined, and settled.
 "In Cooley on Constitutional Limitations their purpose is defined as follows: `The purpose of these provisions was, first, to prevent hodge podge or log-rolling legislation; second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire.'
 ". . . The Supreme Court of the United States, in the case of Louisiana v. Pillsbury, 105 U.S. 278, 26 L.Ed. 1090 1882, in an opinion rendered at the October term, 1881, discussing a similar constitutional provision, said: `A similar provision is found in several state constitutions. Its object is to prevent the practice, common in all legislative bodies where no such provision exists, of embracing in the same bill incongruous matters having no relation to each other, or to the subject specified in the title, by which measures are often adopted without attracting attention, which if noticed would have been resisted and defeated, it thus serves to prevent surprise in legislation.'
 ". . . Hence there was a reason why the framers of the Constitution were not content with the words `shall be expressed in the title', or `shall be described in the title,' etc., ordinarily used by other states, but, in order to emphasize the importance of this provision, used the words `shall be clearly expressed in the title.'
 "Hence, it appears that, as the initiative and referendum powers are reserved to the people, and as the people reserve unto themselves the right to initiate laws enacted by the legislature, the purpose of this constitutional provision is, not only to give clear notice to the legislative body, but to give clear notice to the people, as to what an act may contain.
 "Hence, bearing all the foregoing reasons in view, it must be seen that the title of an act is of more importance to the electorate of this state, and that the question of sufficiency of the title will be subjected to closer scrutiny by the courts of this state, . . ." Emphasis added 215 P. 947, 948.
Oklahoma Light and Power Company v. Corporation Commission, 220 P. 54
(Okla. 1923), states:
 ". . . It was intended by this constitutional provision to forbid the Legislature from embracing in any one act two or more unconnected subjects. Anything in an act not germane to the general purpose expressed in the title brings such a statute within this constitutional prohibition. . ."
In Missouri-Kansas-Texas R. Co. v. Washington County, 276 P. 769
(Okla. 1929), the Court said:
 ". . . This law was designed to prevent, first, the joining of the same bill subjects diverse in their natures, and having no necessary connection; and, second, the insertion of clauses in a bill of which the title gives no intimation." 276 P. 774.
See also Turner v. Cox 280 P. 568, 569 (Okla. 1929); C. C. Julian Oil and Royalties Company v. Capshaw, 292 P. 841, 843 (Okla. 1930); State ex rel Oklahoma State Highway Commission v. Horn, 105 P.2d. 234, 238 (Okla. 1940). Although arising out of a multiplicity of factual situations, these decisions are clear in their import. The constitutional requirement that a statute embrace but one subject which shall be clearly expressed in the title of the statute is mandatory. State v. Nealy, 50 Okla. Cr. 63,296 P. 510; Guinn v. Rivers, 559 P.2d. 864 (Okla.Cr. 1977).
In Board of County Commissioners v. Oklahoma Tax Commission, 212 P.2d. 462 (Okla. 1949), the Supreme Court of Oklahoma was confronted with a statute entitled:
 An act relating to the public schools of Oklahoma and . . . `dealing with the distribution of automobile license and farm truck tax and gross production tax; amending 47 O.S. 22.2 (1941), as amended' "
Subdivision (e) of the Act directed the County Clerk in the allocation and distribution of monies derived from the tax to municipalities within the county. The county commissioners brought an original proceeding in the Supreme Court to enjoin the county treasurer from allocating and distributing funds pursuant to the statute in question on grounds that it was violative of the Oklahoma Constitution, Article V, Section 57. After reciting the quoted language from Louisiana ex rel. Southern Bank v. Pillsbury, supra, the Court stated:
 ". . . The purpose of the constitutional provision under consideration is to forbid the joining of diverse or unconnected subjects in one and the same act . . ."
 "The subject-matter of the Act, House Bill 120, is the public school system. The funds allocated to counties in subdivision (b) of said 47 O.S. 22.2 were to be used for school purposes. . . Such cannot be said of the proviso incorporated in subdivision (e). The funds provided under subdivisions (d) and (e) are allocated to governmental agencies which are distinct from the constituted school authorities and are committed to uses that are distinct from school purposes . . . By reason of such fact one considering the title of the Act instead of anticipating the possibility of such an enactment would be lead to conclude, and justifiably so, that no such enactment appeared therein. For the same reason one reading the Act would, in view of the title thereof, be surprised by the incorporation of such amendment thereto. Under authority of said holdings of this Court the amendment House Bill 120 is violative of Article V, Section 57 of the Constitution." (Emphasis added 212 P.2d 466.
Enrolled Senate Bill 49 purports in its title to be "An Act Relating to Oil and Gas," and after alluding to Sections 1 short title and 2 definitions, continues:
 ". . . RESTRICTING THE OPERATION OF INDEFINITE PRICE ESCALATOR CLAUSES IN CERTAIN CONTRACTS; ALLOWING CERTAIN PRICE INCREASES; ALLOWING CONTRACT RENEGOTIATIONS; PROVIDING CERTAIN DUTIES FOR THE CORPORATION COMMISSION, PROVIDING FOR APPEALS — PROVIDING FOR A METHOD BY WHICH CERTAIN ESCALATIONS MAY BE INCLUDED IN FUEL OR PURCHASE POWER ADJUSTMENT CLAUSES OR OTHERWISE CHARGE; PROVIDING FOR THE DISTRIBUTION OF PROFITS UNDER CERTAIN CIRCUMSTANCES; PROVIDING FOR THE TERMINATION OF PRICE LIMITATIONS; REQUIRING CERTAIN REPORTS BY THE CORPORATION COMMISSION; . . ."
The subject of Senate Bill No. 49 is the provision in Section 4 restricting the operation of indefinite price escalator clauses. Section 3 limits the coverage of the Act to:
 ". . . Natural gas purchase contracts entered into before April 20, 1977, providing for the sale, within this state, of natural gas produced in this state and not committed or dedicated to interstate commerce on November 8, 1978, . . ."
Sections 5, 6 and 7 carve out well-defined exceptions to the restriction set forth in Section 4. Section 8 assures against constructive limitation of the right to voluntarily re-negotiate price provisions in the natural gas purchase contracts referred to in Section 4. Section 9 vests implementation jurisdiction in the Corporation Commission, subject to the appellate jurisdiction vested in the Supreme Court set forth in Section 10. Section 11 relates to price adjustment payments made pursuant to court order resulting from "any Declaration, Order or Judgment" that any provision of the Act is invalid or inoperative. Section 13 terminates all price limitations defined in the Act as of December 31, 1984. Sections 14 and 15 direct codification and declare an emergency.
Clearly, the essence of the legislation is set forth in Section 4. The pertinent terms in that section, "gas purchase contract" and "indefinite price escalator clause," are defined in Section 2. Section 4 provides that the price allowed by Federal legislation, or the price paid, or to be paid, for any natural gas in this state:
 ". . . shall not be taken into account in applying any indefinite price escalator clause contained in any gas purchase contract subject to this act . . ."
By contrast, Section 12 directs the Corporation Commission to prescribe a formula relative to the accrediting of the gross profits of public utilities. The apparent effect is to permit public utilities to absorb ten percent (10%) of the gross profits derived from the sale in interstate commerce of gas purchased at statutorily restricted intrastate rates. Section 12 accomplishes this result through language purporting to assure the in-state customers of public utilities that ninety percent (90%) of the gross profits derived from the sale in interstate commerce of natural gas produced in this state will be accredited to their accounts. That language is unrelated to any restriction imposed upon the operation of indefinite price escalator clauses in gas purchase contracts, and is not embraced by the title phrase:
 ". . . PROVIDING FOR THE DISTRIBUTION OF PROFITS UNDER CERTAIN CIRCUMSTANCES; . . ."
If it were so embraced, the violence to Article V, Section 57, would remain unavoided. The constitutional language requires that an act of the legislature:
". . . embrace but one subject . . ."
Section 12 integrates within Enrolled Senate Bill No. 49 a duality of subjects. Equally important, Article 5, Section 57 mandates that the single subject embraced within the legislative act:
 ". . . shall be clearly expressed in its title . . ." Emphasis added
The artifice of concealing a guaranteed return on gross profits to a regulated industry within an act relating to oil and gas affords a textbook example of the rationale underlying the constitutional prohibition. The subject of Section 12 is not embraced by the subject framed by the balance of Senate Bill 49, and is not clearly expressed in the title of that Bill, as enacted.
It is, therefore, the opinion of the Attorney General that yourquestion be answered as follows: Section 12 of Senate Bill 49,Thirty-Seventh Legislature, First Regular Session, 1979, March 19, 1979,violates the Oklahoma Constitution, Article V, Section 57, and is,accordingly, invalid and inoperative.
JAN ERIC CARTWRIGHT, ATTORNEY GENERAL OF OKLAHOMA
JOHN PAUL JOHNSON, ASSISTANT ATTORNEY GENERAL